IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

ORVILLE TAFT KITCHEN, III,

Plaintiff,

V. CIVIL ACTION NO. 3:06-0889

TERESA WAID, Warden,
Huttonsville Correctional Center,

Defendant.

**MEMORANDUM ORDER**

On June 12, 1998, following a three-day jury trial in the Circuit Court of Wayne County, Orville Taft Kitchen, III was convicted of aggravated robbery and kidnaping. On August 25, 1998, he was sentenced by the court to two concurrent terms of sixty years imprisonment. His conviction was affirmed on appeal.[1] Thereafter, Kitchen filed a petition for writ of habeas corpus in the Circuit Court of Wayne County. This petition was denied in an "Opinion Order Denying Writ Of Habeas Corpus Petition Without A Hearing," and Kitchen's subsequent petition for appeal from the denial of habeas relief was refused by the Supreme Court of Appeals on July 12, 2006. Kitchen then filed a petition for writ of habeas corpus under the provisions of 28 U.S.C. § 2254 with this Court. In his petition, Kitchen asserts numerous grounds for relief, many of which involve matters of state law. The evidence upon which petitioner's conviction is based has been summarized by the Supreme Court of Appeals of West Virginia in its decision affirming his conviction as follows:

---

[1] State v. Kitchen, 536 S.E.2d 488 (W.Va. 2000).

On the morning of October 15, 1997, Kitchen, his wife Angela, and her brother James left a bar in Huntington, West Virginia, and began to drive home in Wayne County on Route 75. Sometime during the trip, Kitchen and Angela began arguing and the argument escalated into a physical altercation. Angela demanded that her brother James, who was driving the vehicle, pull to the side of the road so that she could exit the vehicle. He did so. James later testified that he attempted to defend his sister as she was leaving the vehicle, but Kitchen then became violent with James.

After exiting the vehicle, Angela flagged down an oncoming automobile and excitedly told the driver "Get me out of here. He's trying to hurt me." The driver of the second car, a Mr. Wilson, was a resident of Ohio who was traveling on Route 75 through West Virginia on his way to work in Kentucky. After driving approximately 500 to 600 feet, Mr. Wilson inquired of Angela what had transpired and if she was injured. Angela informed him that she had just been in a fight with her husband and that she had left the vehicle in which she, her husband and her brother had been riding. Upon learning that he had just become a player in the middle of a domestic dispute, Wilson pulled off the road and asked Angela to please exit his vehicle because he had no desire to become involved in someone else's family quarrel. Angela exited the vehicle as requested and began walking down the road.

Apparently when Kitchen and James saw Angela enter Wilson's vehicle, they decided to chase the vehicle to convince Angela to return to their vehicle. Unfortunately, when Wilson was pulled over in order to allow Angela an opportunity to exit, Kitchen and James drove by and somehow did not see Angela exit the Wilson vehicle.

When Kitchen and James spotted Wilson's vehicle approach from behind, they slowed down and forced it to the side of the road and then blocked it. Kitchen approached Wilson at the driver's side window and asked him where Angela was. Wilson informed Kitchen that he had dropped Angela off on the side of the road not far from where he had picked her up. Kitchen did not believe Wilson, but did instruct James to go back to the spot where she allegedly had been dropped off. At trial Wilson testified that after James drove off, Kitchen began threatening Wilson's life. He further testified that Kitchen kept asking about his wife and telling Wilson that he was going to kill him.

According to Wilson, at one point he attempted to drive away, but Kitchen grabbed the steering wheel through the window and forced the car into a ditch, flattening the front tire. Kitchen does not dispute the fact that he stopped Wilson from driving away, but claims it was because he did not want to let him leave until Angela had been located.

Wilson testified that sometime thereafter James drove by with Angela and honked the horn at Kitchen. However, James testified that when he and Angela drove by the spot where he and Kitchen had stopped Wilson, he did not see anyone, so he and Angela simply returned home.

Wilson testified that after his escape had been foiled, but before James and Angela came by, Kitchen continued to threaten his life, telling him he had a shotgun in his vehicle and upon the return of James he was going to employ the weapon. The threats were followed by Kitchen punching Wilson in the mouth causing it to bleed. Wilson stated that he repeatedly asked Kitchen to allow him to leave, but his requests were met with scorn and additional threats.

Kitchen, according to Wilson, eventually reached into the vehicle, turned off the engine, and removed the keys. After removing the keys, Kitchen again punched Wilson in the mouth and repeated his threats. Kitchen then asked Wilson if he possessed any alcohol or money. Wilson testified that he produced six one dollar bills which were stuffed into one of Kitchen's pocket.

After obtaining the money, Kitchen ordered Wilson into the trunk of the vehicle which Wilson refused to do. Subsequently, Kitchen instructed Wilson to move over into the passenger's side; he did so. Kitchen got into the driver's seat. Kitchen backed the vehicle out of the ditch, and began driving down the road toward McCoy Diesel, a facility that was located approximately a mile from where they had stopped.

When they reached McCoy Diesel, Wilson was able to jump out of the car. He testified that when he was jumping out of the car, Kitchen grabbed at him but that he was able to free himself of Kitchen's hold.

Wilson then ran to a security guard who was working at McCoy Diesel and requested that the guard take him to a telephone. The guard took him to a gas station where Wilson called the police. The guard testified that Wilson had a “busted” lip and that he had bled all over the side of his truck door.

A West Virginia State Police trooper was dispatched to pick up Wilson. The trooper testified that Wilson was very nervous and upset and that his “mouth was busted... [and that] both his upper and lower lips were bleeding.” While questioning Wilson, the trooper received a phone call about a domestic dispute. A fellow trooper went to the site of the domestic dispute-the home of Kitchen and Angela. In approaching Kitchen's residence, the trooper noticed the Wilson vehicle nearby. The trooper later testified that the vehicle was abandoned, “just around the corner from [Kitchen's] residence.” The trooper also testified that the right front tire was no longer on the rim and that the right quarter panel door and left quarter panel door

> were both damaged. Finally, the trooper testified that he found six one dollar bills in Kitchen's pocket.

Id. at 490-91.

In evaluating petitioner's claims, the Court, as an initial matter, takes account of fact that the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes significant restrictions on the power of federal courts to grant relief in habeas proceedings initiated by state prisoners. Thus, when, as in this case, claims asserted in a federal habeas petition have been adjudicated in state court relief is available only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2254(d)(2).[2] The critical phrases contained in Section 2254(d)(1) are "contrary to" and "unreasonable application," and the Supreme Court has said that "independent meaning" must be given to both clauses. Williams v. Taylor, 529 U.S. 362, 404 (2000). With respect to the first clause, a state court decision is contrary to precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the Court. Id. at 405. With respect to the unreasonable application clause, a federal habeas court "may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts

---

[2]It is the decision of the circuit court denying habeas relief to which the Court looks, however, the circuit court deferred to the Supreme Court of Appeals on claims raised and decided in petitioner's direct appeal.

of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002). The focus of this "inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable" as distinguished from being merely "incorrect." Id.[3]

Taking cognizance of these limits on federal court review of state prisoner habeas proceedings, it is clear that the state court adjudication of petitioner's claims precludes granting relief in this Court.

Petitioner has asserted that the circuit court was "clearly wrong" in failing to conduct an omnibus hearing under state law with appointed counsel to represent him at the hearing.[4] The Supreme Court has "stated many times" that "'federal habeas corpus relief does not lie for errors of state law'" and "it is not the providence of a federal habeas court to reexamine state-court determinations on state-law questions," the federal courts being "limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Whether there is a right under state law to an evidentiary hearing in every case is doubtful.[5] There is, however, clearly no right under the Constitution to such a hearing, and

[3]In making this distinction, the court referenced its discussion of the "unreasonable application" clause in Williams v. Taylor, supra. at 411, where it had pointed out that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

[4]Counsel was appointed to represent Kitchen and filed a memorandum in support of his petition.

[5]See, White v. Haines, 601 S.E.2d 18, 23 (W.Va. 2004).

claims of "infirmities in ... state postconviction proceedings ... cannot serve as a basis for federal habeas relief." Bryant v. State of Maryland, 848 F.2d 492, 493 (4th Cir. 1988).[6]

Similarly, petitioner's claim that the court erred in failing to instruct the jury on the "lesser included offense of False Imprisonment" involves only a matter of state law for, as is pointed out in Martin v. Ballard, No. 6:07-cv-00014, 2008 WL 803155 at *1-2 (S.D. W.Va. March 20, 2008), "[t]he Supreme Court has not recognized a federal constitutional right to a lesser included offense instruction in a non Capital case"[7] and as a consequence the "state court's decision to deny" relief "on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law." In the Proposed Findings and Recommendation being reviewed in Martin v. Ballard, supra. at 23, Magistrate Judge Stanley concluded that "there is no such crime as false imprisonment, and no statutory penalty therefore." This Court has been unable to locate a reported decision in West Virginia involving the crime of false imprisonment and concludes, as well, that, while civil relief may be available, there is no criminal offense which could be characterized as false imprisonment under West Virginia law.

Petitioner's claim that the "trial court's instruction ... while not an inaccurate statement of the law, neither mirrored the indictment nor described the petitioner's behavior as proven by the evidence," is nothing more than an expression of his belief concerning what jurors may or may not have concluded from the evidence. Thus, he asserts that the "jury could not believe, in a logically and legally consistent manner, [that] Mr. Kitchen was using Mr. Wilson to protect or shield himself

---

[6]See also, Lawrence v. Branker, 517 F.3d 700, 717 (4th Cir. 2008) (state prisoner has no constitutional right to post-conviction proceedings in state court).

[7]In support of its view, the court cites Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980) and Bates v. Lee, 308 F.3d 411, 418 (4th Cir. 2002).

or to evade capture or arrest because no testimony states as much."[8] The evidence clearly supports an inference that petitioner transported his victim in the victim's car to avoid arrest and that was an argument made by the prosecution. Moreover, as the West Virginia Supreme Court pointed out in its opinion, State v. Kitchen, supra. at 491-92, the circuit court also instructed the jury that the offense was committed if "for the purpose or with the intent of taking ... from such person, any ... money or other thing," a "purpose" which was also supported by the evidence. Under such circumstances, the West Virginia Supreme Court's decision approving the instructions, involving principally a matter of state law, was clearly neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

In petitioner's next claim, relying on the decision of the court in Apprendi v. New Jersey, 530 U.S. 466 (2000), he asserts that his sentence was determined by factors which were actually elements of the offense and should have been submitted to the jury. While the West Virginia Supreme Court has determined that sentencing under the kidnaping statute is not violative of Apprendi and its progeny,[9] this question is not reached inasmuch as it was first raised by petitioner in his habeas petition filed in the Circuit Court of Wayne County. As the court held in Burch v. Corcoran, 273 F.3d 577, 584 (4th Cir. 2001), Apprendi claims raised for the first time in a habeas proceeding are precluded by the court's "decision in United States v. Sanders, 247 F.3d 139 (4th Cir. 2001)," a decision in which the court concluded that the new rule of criminal procedure announced

---

[8] An instruction given by the court told the jury that kidnaping was committed when a person by force or threat transported another person "for the purpose or with the intent of shielding or protecting himself or others from bodily harm, or of evading capture or arrest after he or they have committed a crime."

[9] State v. Haught, 624 S.E.2d 899 (W.Va. 2005).

in Apprendi was, in light of Teague v. Lane, 489 U.S. 288 (1989), not to be applied retroactively to cases, such as petitioners, on collateral review. United States v. Sanders, supra. at 147-48.[10]

Petitioner next asserts that the sentence imposed following his conviction was excessive and violated the Cruel and Unusual Punishments Clause of the Eighth Amendment. As the court pointed out in Solem v. Helm, 463 U.S. 277, 284 (1983), the "principle that a punishment should be proportionate to the crime is deeply rooted ... in common-law jurisprudence" and the "constitutional principle of proportionality," id. at 286, requiring that punishment "'should not be, by reason of its excessive length or severity, greatly disproportionate to the offense charged,'" id. at 285, has long been recognized. Nevertheless, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences" will be "exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980). While there had been some uncertainty with regard to the applicability and the scope of the Eighth Amendment to other than capital sentences, it is now clear that "[t]he Eighth Amendment proportionality principle also applies to noncapital sentences." Harmelin v. Michigan, 501 U.S. 957, 997 (1991) (Kennedy, J. concurring in part and concurring in judgment). It is, however, a "narrow proportionality principle," id. which "does not require strict proportionality between crime and sentence," forbidding "only extreme sentences that are 'grossly disproportionate' to the crime." Id. at 1001. When, as in this case, a claimed Eighth Amendment violation is raised in the context of federal habeas review of an Eighth Amendment claim previously adjudicated in state court, relief is available, as has been seen, only if the state court decision was contrary to or involved an unreasonable application of clearly established federal law. From a review of the record,

[10]The court's decisions with respect to claims based on Blakely and Booker adhered to its view that the decisions did not "apply retroactively to cases on collateral review." United States v. Morris, 429 F.3d 65, 66 (4th Cir. 2005).

it seems clear that the state habeas court's denial of relief on this claim was neither contrary to nor involved unreasonable application of the governing principles set forth by the court in Solem and its progeny. The circuit court pointed out in its opinion order that, in sentencing petitioner, the court took account of his age, recognizing that he "already had an extensive criminal record" which included twenty-one known arrests, involving twenty-one misdemeanor charges and twenty-four felony charges. The court further expressed the view that petitioner had shown "a complete disregard for the law, failed to display any remorse for his crimes, and refused taking any responsibility for his actions." In light of these facts, the sentence imposed in this case cannot be characterized as extreme or grossly disproportionate, nor was the decision of the state court judge denying habeas relief on the Eighth Amendment claim contrary to or an unreasonable application of Supreme Court precedent.

Petitioner's remaining claims require little comment. He asserts that the evidence was insufficient, drawing inferences from the evidence which are clearly different from those drawn by the jury. As is apparent from the recitation of the facts set forth in the decision of the West Virginia Supreme Court of Appeals and from this Court's review of the record, it is plain that the evidence, viewed in the light most favorable to the prosecution, was such that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). Petitioner alleges ineffective assistance of counsel. He bases this claim on counsel's failure to request a lesser included offense instruction on false imprisonment and her alleged failure, on cross-examination, to "force" the victim to "name an exact moment when he turned over money to the defendant" and to fully question the victim concerning "when Petitioner allegedly grabbed Mr. Wilson's keys." As previously noted, there is really no reason to think that

false imprisonment is a crime under West Virginia law. To the extent that it might be, the circuit judge explained quite cogently why he refused to give such an instruction, pointing out that, on the basis of the evidence presented at trial, no rational jury could have found petitioner guilty of false imprisonment. Further, in his opinion order, the circuit court judge pointed out that petitioner's counsel did, in fact, "question Wilson about the exact moment petitioner took Wilson's money" and also questioned him "at length on cross-examination about petitioner grabbing Wilson's car keys." Nothing presented by petitioner or contained in the record before the Court contradicts the judge's findings, nor would the evidence support a finding "that counsel's representation fell below an objective standard of reasonableness, Strickland v. Washington, 466 U.S. 668, 687-88 (1984), or that counsel's performance prejudiced the defense. The decision of the circuit court judge denying this claim relied principally on Strickland's criteria and was clearly neither contrary to nor an unreasonable application of, clearly established federal law. Finally,[11] petitioner's claim of "cumulative error" clearly provides no basis for relief in light of the fact that the Court has not found error in the proceedings.

In accordance with the foregoing, respondent's motion for summary judgment will be granted, relief will be denied, the petition for writ of habeas corpus will be dismissed, and it is so **ORDERED**. All matters in this case being concluded, it is **ORDERED** dismissed and retired from the Court's docket.

---

[11]In his petition, though not in his memorandum in support of the petition and response to respondent's motion, petitioner asserts that "[b]ecause the kidnaping was incidental to the aggravated robbery, the kidnaping charge should have been dismissed." This claim, however, is one of state law and, as has been seen, provides no basis for relief.

The Clerk is directed to transmit a copy of this Memorandum Order to plaintiff and all counsel of record.

ENTER: September 30, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE